# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kathleen Sigler,<br><br>             Plaintiff,<br><br>v.<br><br>Ecolab, Inc. and Does 1–100,<br><br>             Defendants. | Case No. 20-cv-1389 (SRN/ECW)<br><br><br>**ORDER ON DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT** |

Michele M. Vercoski, Richard Dale McCune, Jr., and Tuan Q. Nguyen, McCune Wright Arevalo, LLP, 18565 Jamboree Rd., Ste. 550, Irvine, CA 92612; Timothy J. Becker and Jacob Robert Rusch, Johnson Becker PLLC, 444 Cedar St., Ste. 1800, St. Paul, MN 55101, for Plaintiff

David J. Carrier, Michelle Rognlien Gilboe, Carli D. Pearson, Douglas L. Pfeifer, Richard G. Morgan, Alexa Ely, Lewis Brisbois, 90 S. 7th St., Ste. 2800, Minneapolis, MN 55402, for Defendants

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Motion for Summary Judgment [Doc. No. 16] and the Motion to Exclude Expert Testimony [Doc. No. 21] filed by Defendants Ecolab, Inc. and Does 1–100.  Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court grants Defendants' Motion for Summary Judgment and grants in part and denies as moot in part Defendants' Motion to Exclude Expert Testimony.

## I.    BACKGROUND

Beginning in September 2014, Plaintiff Kathleen Sigler, an Oregon resident, worked as an environmental services housekeeper at Curry General Hospital ("Curry Hospital") in North Bend, Oregon.  (Carrier Decl. [Doc. No. 19], Ex. 9 at 7, 111:22–23; 170:19–25.)  Sigler, who is currently age 60, suffered from several medical conditions, including abnormal pulmonary function tests, chronic obstructive pulmonary disease, chronic hypertension, gastroesophageal reflux disease, and smoking history.  (Carrier Decl., Ex. 10 (Lineback Rpt.) at 2; *id*., Ex. 9 (Sigler Dep.) at 7, 315.)

Defendant Ecolab is a Delaware corporation with its principal place of business in St. Paul, Minnesota.  Among the cleaning and hygiene products that Ecolab develops, manufactures, and sells is OxyCide, a surface disinfectant used in hospital and healthcare settings to reduce the risk of dangerous infections of the bacterium Clostridium difficile.  (Carrier Decl., Ex. 1 (Carbone Dep.) at 41–49.)  Ecolab sells OxyCide in concentrated form, along with a proprietary closed-loop dispensing system, to prevent workers from coming in contact with the concentrated product due to the strength of its chemical components.  (*Id*. at 74–75.)  In January 2012, the EPA approved Ecolab's registration of the concentrated and diluted products, finding that workers could safely use the diluted product without wearing any PPE.  (Carrier Decl., Exs. 7 (Reg. Notice) & 8 (Dilution Label).)  Ecolab brought OxyCide to market in September 2013.  (Carbone Dep. at 251.)

The "Doe Defendants" are manufacturers, suppliers, distributors, trademark owners, or re-packagers of chemical products and related equipment to which Plaintiff was exposed.  (Compl. [Doc. No. 1] ¶¶ 11–13.)  Because Sigler alleges that the Doe Defendants

were acting as the agents, employees, co-conspirators and/or alter egos of their co-defendants, (*id.* ¶ 14), the Court refers to Ecolab and the Doe Defendants collectively as "Defendants" or simply as "Ecolab."

In September 2016, Curry Hospital began using OxyCide. (Carrier Decl., Ex. 12 (Sanford Dep.) at 28, 40.) On September 17, 2016, Sigler received training from her supervisor on the safe use of the cleaning product. (Sigler Dep. at 250–54.) After the training, Sigler used OxyCide in her cleaning duties that day. (*Id.* at 282–83.) As she worked, Sigler began to experience physical symptoms including tearing eyes, runny nose, phlegm, throat issues, coughing, headache, and breathing difficulties. (*Id.*) She attributed the problems to her OxyCide exposure and reported her concerns to her supervisor, Kimberly Sharp. (*Id.* at 283.)

Over a five-day period, Sigler used OxyCide during portions of her eight-hour shift. (*Id.* at 286–90.) She continued to report physical complaints to Sharp, and asked the hospital to discontinue using OxyCide and return to using the previous cleaning products. (*Id.* at 291.) On September 21, 2016, while Sigler was cleaning hospital rooms with OxyCide, she had difficulty breathing and nearly passed out, prompting Sharp to take her to the emergency room. (*Id.* at 297–98.)

Afterwards, Sharp examined the hospital's OxyCide dispenser to determine whether it was functioning properly and found that it was. (Carrier Decl., Ex. 13 (Sharp Dep.) at 15.) Sharp then used Sigler's cleaning rags and OxyCide solution to clean the rest of the rooms that had been assigned to Sigler. (*Id.*) In the process, Sharp developed a sore throat and headache. (*Id.*)

By the time Sigler returned to work on September 24, 2016, Curry Hospital had stopped using OxyCide. (Sigler Dep. at 305.)

Sigler continued to experience burning eyes and nose, a sore throat, and breathing difficulties that she attributed to OxyCide exposure. (Compl. ¶ 30.) She filed a claim for workers' compensation benefits, identifying her exposure to the cleaning product as the cause of her injury, and listed September 21, 2016 as the date of injury. (Carrier Decl., Ex. 15 (Workers' Comp. Form).)

In connection with her workers' compensation case, Sigler met with several medical providers, some of whom attributed her continuing medical problems to OxyCide exposure, while others found no correlation. (*Compare, e.g.,* Carrier Decl., Ex. 17 (Monroe Records), *with* Carrier Decl., Ex. 20 (Bardana IME).) In 2018 and 2019, Sigler treated with pulmonologist Dr. Aaron Trimble. (Carrier Decl., Exs. 23 (10/24/18 Record); 24 (Trimble Dep.) at 13–14.) Dr. Trimble diagnosed Sigler with "[c]hemical induced pneumonitis, dysfunctional airway phenotype (reactive airways disease)" based on her exposure to OxyCide. (10/24/18 Record; Trimble Dep. at 13–14.) Following a subsequent visit in 2019, Dr. Trimble did not change his diagnosis, but noted that other causative factors could be involved in Sigler's lung problems. (Carrier Decl., Ex. 25 (4/24/19 Record).) In a subsequent Independent Medical Examination (IME) performed by Dr. Brent Burton, Dr. Burton found no causal connection between Sigler's OxyCide exposure and continuing pulmonary symptoms or the acute symptoms she described when working with the product. (Carrier Decl., Ex. 26 (Burton IME) at 13.)

Ultimately, an administrative law judge (ALJ) found Dr. Trimble's opinion most persuasive, noting his "complete and accurate history," his expertise relevant to the case, and that he had successfully rebutted the opinions of the IME doctors.   (Vercoski Decl. [Doc. No. 47], Ex. 52 (Workers' Comp. Order) at 11–14.)   Accordingly, the ALJ determined that Sigler was entitled to workers' compensation benefits.  (*Id.*)

On June 16, 2020, Sigler filed this lawsuit against Ecolab, with subject matter jurisdiction based on diversity of citizenship.  (Compl. ¶ 15.)  She asserts state law claims for strict liability based on design defect, manufacturing defect, and failure to warn, as well as negligence, breach of express warranty, breach of implied warranty, intentional misrepresentation, negligent misrepresentation, and fraudulent concealment.  (*Id.* ¶¶ 84–195.)

Ecolab moves for summary judgment, arguing that Oregon state law applies, under which Sigler's claims are barred by the applicable statute of limitations.  (Defs.' Mem. [Doc. No. 18] at 19–28.)  Also, Ecolab contends that Sigler cannot establish causation.  (*Id.* at 28–34.)  In addition, Ecolab asserts that each of Sigler's claims fail as a matter of law. (*Id.* at 35–43.)  In a separate motion, Ecolab moves to exclude the opinions of Plaintiff's non-retained experts Dr. Courtney Ridley, Dr. Joan Monroe, and Dr. Aaron Trimble.  (*See* Defs.' *Daubert* Mem. [Doc. No. 23].)  Ecolab contends that the experts' opinions fail to meet the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

Sigler opposes Ecolab's summary judgment motion, arguing that Minnesota law applies, under which her claims meet the applicable statute of limitations.  (Pl.'s Opp'n

[Doc. No. 53] at 24–33.)  In addition, she contends that she can establish causation under Minnesota law and that her claims also survive as a matter of law.  (*Id*. at 34–58.) Regarding Ecolab's motion to exclude the opinions of the three non-retained experts, Sigler does not oppose the exclusion of the opinions of Drs. Ridley and Monroe.[1]  (*See* Pl.'s *Daubert* Opp'n [Doc. No. 61] at 4–22.)  With respect to Dr. Trimble, Sigler argues that his opinions are relevant under Minnesota law and his differential diagnosis sufficiently meets the requirements of Rule 702 and *Daubert*.  (*Id*.)

## II.   DISCUSSION

### A.   Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc*., 812 F.3d 701, 707 (8th Cir. 2016).  And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

---

[1] Because Sigler does not oppose Ecolab's motion to exclude Drs. Ridley and Monroe, the Court grants in part Ecolab's Motion to Exclude Non-Retained Experts with respect to these two experts.

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

### B.    Choice of Law

The last date on which Sigler was exposed to OxyCide, and the date she has identified as the date of injury, was September 21, 2016. (Carrier Decl., Ex. 15 (Workers' Comp. Form).) She filed the Complaint in this case on June 16, 2020. She argues that her claims were timely filed under Minnesota's applicable statutes of limitations, which set forth limitations periods of four years for strict liability claims, six years for Sigler's other tort claims, and four years for sales contract claims. Minn. Stat. § 541.05, subds. 1(9); subd. 2; Minn. Stat. § 336.2-725. However, Ecolab argues that Sigler's claims are subject to Oregon's two-year statute of limitations for all claims arising from personal injury caused by products liability, and because they were untimely filed, they must be dismissed. Or. Rev. Stat. § 30.905.

A federal court sitting in diversity applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Whitney v. Guys, Inc.*, 700

F.3d 1118, 1123 (8th Cir. 2012).  Minnesota's choice-of-law methodology involves the following steps: (1) determining whether the differences between each state's law results in an outcome-determinative conflict; (2) if a conflict exists, determining whether it is constitutionally permissible to apply each state's law to the case; and (3) deciding which state's law is favored, after considering a multifactored test commonly referred to as "Leflar's five choice-influencing factors."[2]  *Blake Marine Grp. v. CarVal Investors LLC*, 829 F.3d 592, 596 (8th Cir. 2016) (citing *Whitney*, 700 F.3d at 1123–24).

Traditionally, before reaching the Leflar analysis, Minnesota courts were required to determine whether the rule of law at issue was substantive or procedural.  *See Danielson v. Nat'l Supply Co.*, 670 N.W.2d 1, 5 (Minn. Ct. App. 2003).  If the law was substantive, it was considered outcome-determinative, leading courts to apply the Leflar analysis to determine which state's law applied.  *Id*. (citing *Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 469 (Minn. 1994)).  However, if the law was procedural, courts applied the law of the forum state and did not analyze the Leflar factors.  *See id*.  At that time, Minnesota courts generally viewed statutes of limitations as primarily procedural.  *Christian v. Birch*, 763 N.W.2d 50, 57–58 (Minn. Ct. App. 2009).

In 2004, Minnesota enacted a new borrowing statute, Minn. Stat. § 541.31, based on the Uniform Conflict of Laws-Limitations Act (UCLLA), to be used in cases involving states' conflicting statutes of limitations.  The statute addressed the circumstances under

---

[2] The factors are named for Professor Robert Leflar, who identified this framework for resolving conflicts of law.  William M. Richman and William L. Reynolds, *Understanding Conflicts of Laws* § 78 (2d ed. 1993).

which a court sitting in Minnesota could "borrow" the limitations period of another state and apply it to a case in Minnesota.  In comments to the identical UCLLA provision on which Minnesota's borrowing statute is based, the editors note that this provision treats limitations periods as substantive, governed by the limitations law of a state whose law governs other substantive issues.  Unif. Conflict of Laws-Limitations Act § 2(a)(2) cmt. (1982).  Accordingly, under Minn. Stat. § 541.31, subd. 1(a)(2), courts "appl[y] the limitations period of the state whose substantive law governs a claim." *Blake Marine*, 829 F.3d at 596 (citing Minn. Stat § 541.31).

### 1.    Outcome Determinative Conflict

As noted, the first step in Minnesota's choice-of-law methodology requires the Court to determine whether an outcome-determinative conflict exists.  *Id*.  An outcome-determinative conflict is one in which "the choice of one forum's law over the other will determine the outcome of the case." *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 94 (Minn. 2000).  Ecolab argues that the laws of Minnesota and Oregon present an actual, substantive conflict that is outcome determinative because if the Court applies Oregon's statute of limitations, Sigler's claims are time-barred, whereas under Minnesota's statute of limitations, they are timely.  (Defs.' Mem. at 19) (citing Or. Rev. Stat. § 30.905; Minn. Stat. § 541.05).

Although Sigler acknowledges that Minnesota's borrowing statute treats statutes of limitations as substantive, she argues that Ecolab's analysis sidesteps the requirements of Minnesota's borrowing statute.  (Pl.'s Opp'n at 24, 26.)  She contends that under Minn. Stat. § 541.31, the Court must determine whether a true conflict exists as to the underlying

legal requirements for each of her claims, not whether a limitations-period conflict exists.[3]

(*Id.*)

Sigler's reading of the interplay between Minnesota's three-step choice-of-law methodology and its borrowing statute is both inaccurate and unnecessarily complicated. As to whether an actual conflict exists, there are differences in Minnesota and Oregon law regarding breach of warranty claims, to be sure, but the overriding outcome-determinative conflict here is whether Plaintiff's claims—all of them—are barred by the conflicting

---

[3] For example, she concedes the existence of an actual conflict of law concerning her breach of express warranty claim, noting that Oregon requires privity of contract between the plaintiff and defendant, while Minnesota does not. (Pl.'s Opp'n at 25.)  The Court acknowledges this conflict of law with regard to privity. *Cf. Torch v. Windsor Surry Co.*, No. 3:17-cv-918-AA, 2019 WL 6709379, at *10 (D. Ore. Dec. 9, 2019) (stating that while privity of contract is not required to state a claim for breach of express warranties resulting in economic losses, "privity of contract is necessary to support a claim for breach of warranty when the damages sought are other than pure economic damages (*e.g.*, personal injuries, property damage)."), *with* Minn. Stat. § 336.2-318 (extending seller's express or implied warranty to any injured person reasonably "expected to use, consume or be affected by the goods.").  However, this case does not involve breach of warranty claims that were timely filed under both Oregon and Minnesota law, in which case the privity requirements, or lack thereof, would necessitate a choice-of-law analysis limited to this issue.  Rather, this case involves the more fundamental question of whether Sigler's lawsuit can proceed on any of her claims based on timeliness.

The Court also notes that even under Sigler's suggested claim-by-claim approach, she does not explain whether the potentially applicable Minnesota and Oregon laws on all of her other claims are identical, resulting in no conflict, or whether they differ.  "Plaintiffs bear the burden of fully analyzing the law of the jurisdictions whose laws may apply to the [plaintiffs'] claims; it is not [the defendant manufacturer's] burden to prove an outcome-determinative conflict exists." *Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 950 (D. Minn. 2020) (citing *Thompson v. Allianz Life Ins. Co. of N. Am.*, 330 F.R.D. 219, 223 (D. Minn. 2019)).

statutes of limitations. *See BNSF Ry. Co. v. L.B. Foster Co.*, 917 F. Supp. 2d 959, 965 n.3 (D. Neb. 2013) (noting that Nebraska applies the limitations period of the state's law on which a claim is substantively based and stating, "Under the circumstances, it seems to me that it is appropriate to focus on the differences between Nebraska's and South Dakota's statutes of limitations to determine whether a choice-of-law analysis is necessary. Moreover, to the extent that BNSF implies that the statutes of limitations are not matters of substantive law, its arguments are rejected.").

Indeed, since the 2004 adoption of Minn. Stat. § 541.31, courts applying Minnesota's choice-of-law methodology to conflicting statutes of limitations have treated such conflicts as substantive and outcome-determinative under the first step of the choice-of-law analysis. *See, e.g.*, *Blake Marine*, 829 F.3d at 595–96 (noting an outcome-determinative conflict based on conflicting limitations periods); *Whitney*, 700 F.3d at 1123 (stating, "Here, the statute-of-limitations issue makes the choice of law outcome-determinative, so there is an actual conflict."); *see also Thompson v. Allianz Life Ins. Co. of N. Am.*, 330 F.R.D. 219, 223 (D. Minn. 2019) (finding differences in states' use of extrinsic evidence in contract interpretation, as well as "the different statutes of limitations for breach-of-contract actions," created a potential outcome-determinative conflict) (citing Minn. Stat. § 541.31, subd. 1)).

Sigler distinguishes *Blake Marine*, arguing that neither the Eighth Circuit nor the district court needed to address the underlying substantive law because the parties had simply agreed that the competing statutes of limitations created an outcome-determinative conflict. (Pl.'s Opp'n at 25.) The Court disagrees with Plaintiff's characterization of *Blake*

11

*Marine*.   Before the district court in that case, the plaintiff presented an outdated substantive/procedural argument in support of its contention that Minnesota's statute of limitations was procedural and therefore Minnesota law applied.   *Blake Marine Grp. v. CarVal Investors, LLC*, No. 15-cv-151 (JNE/JJK), 2015 WL 5008710, at *2 (D. Minn. Aug. 20, 2015).   Rejecting that argument because Minnesota's borrowing statute rendered the substantive/procedural distinction obsolete, the district court stated the general rule "that the limitations period is borrowed from the state whose substantive law applies."   *Id*. Accordingly, the district court applied Minnesota's three-part choice-of-law methodology to first determine whether the different states' laws presented an actual conflict.   *Id*.   at *3. It found "a conflict exists because it is undisputed that Blake's claim is time barred under Alabama law but not Minnesota law."   *Id*.   After determining that both states' laws could be constitutionally applied, the district court proceeded to the third factor, addressing the competitive merits of the two states' laws under the Leflar factors.   *Id*.   at *3–4.   Having concluded that Alabama law controlled, the district court followed Minn. Stat. § 541.31 by applying Alabama's statute of limitations, resulting in the dismissal of Blake Marine's tortious interference claim as untimely.

On appeal, while the parties in *Blake Marine* may have "agreed" that an actual conflict existed, 829 F.3d at 525, the Eighth Circuit did not consequently skip a step in its analysis, as Plaintiff suggests.   (Pl.'s Opp'n at 25.)   Rather, like the district court, the Eighth Circuit employed Minnesota's choice-of-law framework, consistent with Minn. Stat. § 541.31.   It acknowledged the function of the borrowing statute, noted that the two states' statutes of limitations conflicted but could both be constitutionally applied, and considered

12

Leflar's five factors as related to the competing statutes of limitations and the plaintiff's tortious interference claim. *Blake Marine*, 829 F.3d at 595–96. After applying those factors, the court found that Alabama law applied and affirmed the dismissal of the plaintiff's lawsuit as untimely. *Id*.

The Eighth Circuit followed the same approach in *Whitney*, 700 F.3d at 1124–26, a case involving a contractual dispute, by first finding an outcome-determinative conflict based on the conflicting statutes of limitations of Minnesota and Delaware. The court applied the Leflar factors relevant to the limitations periods and contractual terms at issue, concluding that Minnesota law applied, consistent with Minn. Stat. § 541.31. *Id*. at 1124–26 n.6.

The Eighth Circuit's approach in *Blake Marine* and *Whitney* is in accordance with Minnesota's choice-of-law methodology and its borrowing statute.

Moreover, when applying Minnesota's choice-of-law methodology to conflicting statutes of limitation, courts address issues inherent in the underlying claims to determine which substantive statute of limitations applies. Again, addressing identical language in the UCLLA provision on which Minn. Stat. § 541.31 is based, the editors commented, "This section treats limitation periods as substantive, to be governed by the limitations law of a state whose law governs *other substantive issues inherent in the claim*." Unif. Conflict of Laws-Limitations Act § 2(a)(2) cmt. (1982) (emphasis added). Thus, in *Blake Marine*, 829 F.3d at 596, the court addressed issues inherent in the tortious interference claim, comparing the states' competing interests in compensating resident and non-resident tort victims, among other things. Similarly, in *Whitney*, 700 F.3d at 1124–26, in the course of

its choice-of-law analysis, the Eighth Circuit considered issues relevant to the contractual claims at issue, such as share ownership, duties under the purported contract, and possible remedies.[4]

In light of controlling authority from the Eighth Circuit, the Court finds that an actual outcome-determinative conflict exists as to all of Plaintiff's claims because of the conflicting statutes of limitations. *Blake Marine*, 829 F.3d at 595–96; *Whitney*, 700 F.3d at 1123.   Under the circumstances, the Court finds it unnecessary to adopt Plaintiff's suggested approach of applying a choice-of-law analysis to each of her individual claims based on underlying conflicts.  As Plaintiff recognizes, (*see* Pl.'s Opp'n at 3, 33), if Oregon law applies to her claims, they all fail to meet the two-year statute of limitations, whereas if Minnesota law applies, her claims satisfy the four- and six-year statutes of limitations. *Compare* Or. Rev. Stat. §§ 30.905, 30.900, *with* Minn. Stat. §§ 541.05, subds. 1(9); subd. 2; 336.2-725.[5]

_____

[4] The district court in *BNSF Ry.*, 917 F. Supp. 2d 959, also addressed issues inherent in the plaintiff's claims to resolve a statute of limitations conflict in a case arising from a train derailment.  Finding that products liability was the gravamen of all the claims, the court applied Nebraska's choice-influencing factors under the Restatement (Second) of Conflicts, similar to the Leflar factors, through a product liability lens.  *Id*. at 968–75. Among other things, it considered the location where the injuries occurred, as well as competing governmental policies that favor the welfare of injured plaintiffs versus providing defendants with notice of claims against them within a reasonable time.  *Id*. at 968–76.

[5] Under Oregon law, the two-year limitations period for product liability actions applies to *any* claim brought against a manufacturer or seller of a product for damages for personal injury or property damage arising out of design and manufacturing defects, failure to warn, or failure to instruct in the use of a product. Or. Rev. Stat. § 30.900 (emphasis added).  Thus, when a plaintiff predominantly asserts product liability claims, as is the case here, Oregon courts apply the product liability limitations period found in Ore. Rev. Stat.

### 2.   Constitutional Application of Law

The Court next considers whether each state's law may be constitutionally applied to the facts of this case. *Blake Marine*, 929 F.3d at 595. Courts have traditionally examined whether each state has "a significant contact or significant aggregation of contacts, creating state interests, such that the choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13 (1981) (examining constitutionality of applying Minnesota law or Wisconsin law to question of whether uninsured motorist policies could be stacked). Neither party argues that the laws of Oregon, where Sigler resides, was exposed to OxyCide, and incurred her alleged injury, or Minnesota, where Ecolab has its primary place of business, cannot be constitutionally applied. In light of these contacts, the application of either state's law would not be arbitrary or fundamentally unfair.

---

§ 30.905 to the other claims, including breach of warranty. *Philpott v. A.H. Robins Co., Inc.*, 710 F.2d 1422, 1425 (9th Cir. 1983) (finding that Oregon Legislature "intended to include all products related claims within the breadth of Or. Rev. Stat. § 30.905," including plaintiff's claim for breach of warranty); *see also Simonsen v. Ford Motor Co.*, 102 P.3d 710, 721–22 (Or. Ct. App. 2004) (applying statute of repose for product liability actions to plaintiff's claim for breach of warranty resulting in injury).

While Minnesota has similar statutory language for "any action[s]" related to strict liability, "[u]nless otherwise provided by law," Minn. Stat. § 541.05, subd. 2 (proscribing a four-year limitations period), courts have applied the four-year UCC limitations period found in Minn. Stat. § 336.2-725, generally applicable to contracts for sale, to breach of warranty claims, regardless of personal injury. *Mader v. Am. Motors Corp.*, 611 F. Supp. 877, 881 (D. Minn. 1985); *see also Tuttle v. Lorillard Tobacco Co.*, 118 F. Supp. 2d 954, 961 (D. Minn. 2000); *Kociemba v. G.D. Searle & Co.*, 680 F. Supp. 1293, 1301–02 (D. Minn. 1988).

### 3. Choice-Influencing Factors

The Court turns to the third step in Minnesota's choice-of-law analysis—the application of Leflar's five choice-influencing factors. The factors are: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law. *Blake Marine*, 829 F.3d at 96.

### a. Predictability of Results

Ecolab argues that the Court need not consider this factor. (Defs.' Mem. at 20; Defs.' Reply [Doc. No. 65] at 3.) It contends that predictability of results is irrelevant in a tort case because the accidental nature of the injury does not impact the parties' conduct or expectations. (Defs.' Mem. at 20; Defs.' Reply at 3–4.) Sigler, however, distinguishes one-time car accidents from mass tort cases, which, she contends, involve widespread injuries and benefit from predictability of results. (Pl.'s Opp'n at 28.) Sigler maintains that this factor favors the application of Minnesota law. (*Id.*)

Predictability of results "addresses whether the choice of law was predictable before the time of the transaction or event giving rise to the cause of action." *Danielson*, 670 N.W.2d at 7 (emphasis omitted). This factor "represents the ideal that litigation on the same facts, regardless of where the litigation occurs, should be decided the same to avoid forum shopping." *Nodak*, 604 N.W.2d at 94.

Predictability of results is primarily relevant in breach of contract cases, where the parties may wish to know in advance the state law that will govern any potential disputes. *Id.* (citing *Myers v. Gov't Emp. Ins. Co.*, 225 N.W.2d 238, 242 (Minn. 1974)). Thus, while

consideration of this factor in contract cases "preserve[s] the parties' justified contractual obligations," *id.*, "[t]ort actions generally do not implicate party expectations because torts stem from unplanned accidents." *Lommen v. City of E. Grand Forks*, 522 N.W.2d 148, 150 (Minn. Ct. App. 1994). As the Eighth Circuit has explained, "Parties do not commit torts in one state rather than another because of that state's tort laws." *Kenna v. So-Fro Fabrics, Inc.*, 18 F.3d 623, 626 (8th Cir. 1994). Accordingly, in most tort cases, "predictability of results is of little relevance." *Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 964 (D. Minn. 2020). However, this factor may be relevant in cases involving intentional torts. *Blake Marine*, 829 F.3d at 595 n.4.

Because Sigler asserts claims for intentional misrepresentation and fraudulent concealment (Compl., Counts 7 & 9) and, if Minnesota law applies, her claims for breach of warranty (*id.*, Counts 5 & 6) might be considered contract-based, the Court analyzes the predictability-of-results factor.

Sigler relies on *Kolberg-Pioneer, Inc. v. Belgrade Steel Tank Co.*, 823 N.W.2d 669, 673 (Minn. Ct. App. 2012), an indemnity action related to an underlying tort. In *Kolberg-Pioneer*, the Minnesota Court of Appeals acknowledged that while predictability of results is often of little relevance in tort cases, the indemnity claim in that case arose from a consensual business transaction in the form of a sale, and therefore the court considered this factor. *Id.* The court concluded that predictability of results favored the application of Minnesota law, focusing on the sale aspect of the transaction, stating, "Applying Minnesota law to product-liability cases involving a Minnesota manufacturer enables the manufacturer and any downstream seller, whether based in Minnesota or elsewhere, to

17

know the rules that will govern their transactions." *Id*. at 673. Although Sigler's product liability-related claims[6] are different from single-event accident claims, they do not involve downstream sellers.

As to the state law that Sigler could have reasonably expected would apply to a case such as this, prior to the events in question, *Danielson*, 670 N.W.2d at 7, Sigler is an Oregon resident who was working for an Oregon employer at the time of her exposure to OxyCide and at the time of her alleged injury. These facts suggest that the application of Oregon law to any tort claims, intentional or not, arising out of Sigler's on-the-job use of OxyCide would have been a reasonable expectation on her part. *See In re Nat'l Hockey League Players' Concussion Injury Litig.*, 327 F.R.D. 245, 259 (D. Minn. 2018) ("To the extent that this factor may be considered relevant to the Court's choice-of-law analysis [in class action alleging failure to warn and seeking medical monitoring relief], it finds favor in applying the law where each member of the proposed class played [hockey] during his career or currently lives."). There is no indication here that Sigler was even aware that Ecolab had any connection with Minnesota. *See Rapp v. Green Tree Servicing, LLC*, 302 F.R.D. 505, 517 (D. Minn. 2014) (finding, in mortgage-loan putative class action, with respect to class members whose original lenders were not based in Minnesota, "the class

---

[6] The Court considers Sigler's claims for strict liability, negligence, misrepresentation, and fraudulent concealment as her "product liability-related claims." All of these tort-based claims primarily derive from the same allegations in the Complaint. *See BNSF Ry.*, 917 F. Supp. 2d at 966 (characterizing all of plaintiff's claims—negligence, negligent misrepresentation, strict liability, breach of express warranties, and fraudulent misrepresentation—as "product liability actions" for purposes of choice-of-law analysis).

member[s] would have had no reason to predict that Minnesota law would govern any legal claim related to the mortgage or the mortgaged property.").

On its part, Ecolab, headquartered in Minnesota, and where it performed some OxyCide testing in hospitals, could have reasonably expected that Minnesota law would apply to product liability, negligence, and intentional tort claims related to OxyCide. *See Greenstate Credit Union v. Hy-Vee, Inc.*, 549 F. Supp. 3d 969, 977–78 (D. Minn. 2021), (finding it predictable to defendant Hy-Vee, incorporated and headquartered in Iowa, that Iowa law would apply to negligence claims focused on Hy-Vee's decision-making conduct, as all of defendant's relevant employees and decision-making conduct were in Iowa), *appeal dismissed per stipulation*, No. 21-2867 (8th Cir. May 12, 2022).

Accordingly, to the extent predictability of result is relevant to Sigler's product liability-related claims, the Court finds it does not favor either party, and is therefore neutral. *See Trueblood v. MMIC Ins., Inc.*, A21-0452, 2021 WL 5764582, at *2 (Minn. Ct. App. Dec. 6, 2021) (finding predictability of result a neutral factor in professional liability insurance coverage dispute because plaintiff reasonably could have expected Iowa law to apply, given that he was licensed and practiced medicine in Iowa, and insurer could have reasonably expected that Minnesota law would apply to claims related to the administration of its policy in Minnesota, issued by a Minnesota insurance company).

And, to the extent the Court considers issues inherent in Sigler's other claims, the Court reaches the same result under Minnesota law with respect to her breach of warranty

claims, for the same reasons.[7]

### b.      Maintenance of Interstate Order

When considering maintenance of interstate order, "the courts of different states strive to sustain, rather than subvert, each other's interests in areas where their own interests are less strong." *Jepson*, 513 N.W.2d at 471.  The Minnesota Supreme Court has stated that "maintenance of interstate order is generally satisfied as long as the state whose laws are purportedly in conflict has sufficient contacts with and interest in the facts and issues being litigated." *Myers*, 225 N.W.2d at 244.  If a state has such contacts and interest, "th[is] factor is generally not implicated." *Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618, 620–21 (8th Cir. 2001) (citing *Myers*, 225 N.W.2d at 242).  However, if a state "has little or no contact with a case and nearly all of the significant contacts are with a sister state, the factor suggests that a state should not apply its own law to the dispute."  *Id*. (citation omitted) (cleaned up).

In addition, "maintenance of interstate [] order is only minimally implicated where torts are involved."  *Kenna*, 18 F.3d at 626 ("[I]t cannot be said that harmonious relations between states will be advanced by applying Minnesota rather than North Dakota law, or vice versa.").  But this factor may be relevant in tort suits if there is evidence of forum

---

[7] As noted earlier, because Oregon applies its two-year statute of limitations to all claims arising out of products liability, the Court's analysis of predictability of results for Plaintiff's product liability-related claims applies to her breach of warranty claims under Oregon law.  Or. Rev. Stat. § 30.900; *Philpott*, 710 F.2d at 1425; *Simonsen*, 102 P.3d at 721–22.

shopping or one of the states has only a remote connection to the claim.[8] *Blake Marine*, 829 F.3d at 595–96.

Ecolab contends that this factor favors the application of Oregon law because of the following undisputed connections with Oregon: (1) Curry Hospital purchased OxyCide in Oregon; (2) Sigler is an Oregon resident; (3) she used OxyCide in Oregon; and (4) her alleged injury occurred in Oregon. (Def.'s Mem. at 21–22.) By contrast, Ecolab counters that Minnesota's only connection to the facts and issues at issue is the presence of its corporate headquarters in Minnesota. (*Id.*)

On the other hand, Sigler, argues that Minnesota has sufficient contacts with the events in question, well beyond the location of Ecolab's corporate headquarters, such that there is no risk of interfering with the interstate order. (Pl.'s Opp'n at 29.) Sigler asserts that Ecolab participated in the following events in Minnesota: (1) developing and testing OxyCide (*Id.* at 29–31 (citing Vercoski Decl., Ex. 14 at 56; *id.*, Ex. 53 at 116–17)); (2) drafting the EPA label and Safety Data Sheet (*id.*, Ex. 14 at 56; Ex. 53 at 117; Ex. 15 at 1; Ex. 53 at 209–10); (3) conducting initial field testing in Minnesota hospitals (*id.*, Ex. 34 at 6); (4) preparing and distributing sales and marketing literature (*id.*, Ex. 16 at 3; Ex. 53 at 122); (5) designing and developing the closed loop OxyCide bottle and dispenser (*id.*, Ex. 54 at 4; Ex. 1 at 117–20; 246); (6) creating the OxyCide training materials (*id.*, Ex. 53 at 122; Ex. 55 at 1–11; Ex. 56, generally); (7) drafting the OxyCide wall card, pH strip

---

[8] Ecolab does not argue that forum shopping is implicated here, but contends that the public policy of avoidance of forum shopping would be best served by applying Oregon law to Sigler's claims. (Defs.' Mem. at 22.)

instructions, and Key Points Card (*id.*, Ex. 57 at 117–20); (8) requiring all sales contracts with wholesalers and hospitals to be enforced in accordance with Minnesota law (*id.*, Ex. A); (9) tracking all complaints and incidents concerning OxyCide (*id.*, Ex. 58 at 30–31); (10) placing and maintaining ownership of dispensary equipment in hospitals using OxyCide (*id.*, Ex. 1 at 235); (11) directing Ecolab employees to service the dispensary equipment (*id.*, Ex. 57 at 238–39; Ex. 22 at 97–104); and (12) directing Minnesota trainers to teach hospital staff on the use of OxyCide (*id.*, Ex. 22 at 44–45; Ex. 1 at 66–67, 264).)

As noted, the relevance of this factor in a tort context depends on whether Minnesota has only a remote connection to the claims. *Blake Marine*, 829 F.3d at 595–96. If all of Sigler's identified connections were supported by the record, it would appear that "Minnesota's connection with and interest in the facts and issues being litigated" might be sufficient to "mitigate concerns about the disruption of the interstate order." *Id.* at 595–96 (citing *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 739 (8th Cir. 1995)). However, most of Sigler's citations to the record contain no reference to Minnesota. For example, she states that Ecolab drafted the Safety Data Sheet in Minnesota, pointing to the first page of the document, along with deposition testimony. (Pl.'s Opp'n at 29.) But the Safety Data Sheet simply lists Ecolab's Minnesota corporate address under the heading "Product and Company Identification", (Vercoski Decl., Ex. 15 at 1), and the cited deposition testimony states that the work was "handled by the regulatory department," without reference to location. (*Id.*, Ex. 53 at 209–10.) Also, Sigler states that "Ecolab employees were directed from Minnesota to service the [dispensing] machines on a quarterly basis, and part of their job was to specifically calibrate the machine and the product for "efficiency and safety"

concerns." (Pl.'s Opp'n at 31.) But the cited testimony contains no reference to Minnesota.[9]

As another example, Sigler states that Ecolab's Wall Card, pH strip instructions, and Key Points Card were drafted in Minnesota, (Pl.'s Opp'n at 30), but she relies on testimony without regard to location, and from a deponent who testified that the Key Points Card and pH strip instructions were created "before my time." (Vercoski Decl., Ex. 57 at 117–20.) As to her contention that all contracts for Ecolab's sale of OxyCide to wholesalers and hospitals emanated from Minnesota and called for the application of Minnesota law, (Pl.'s Opp'n at 30), the contract fails to support that proposition. Rather,

---

[9] Ecolab rebuts several of Plaintiff's asserted facts regarding contacts with Minnesota in its Reply Memorandum, which it contemporaneously filed with the Declaration of Henry Carbone, Ecolab's Program Director for Enterprise Excellence [Doc. No. 66]. The Carbone Declaration directly responds to matters that Plaintiff raised in her response. *See* D. Minn. L.R. 7.1(c)(3)(B) (prohibiting movant from raising in a reply memorandum new grounds for relief or presenting matters that do not relate to the opposing party's response).

While Sigler asserts that the OxyCide sales and marketing literature and Wall Card instructions were created in Minnesota, Carbone attests that Ecolab employees outside of Minnesota were involved in OxyCide's development, and that Ecolab employees in California "played a major role in developing sales and marketing literature for the product, as well as what is called the 'Wall Card.'" (Carbone Decl. ¶ 7.) With regard to OxyCide sales and safe-use training, Carbone states that account representatives across the country work directly with hospitals, and Ecolab's headquarters has no "hands-on direction" in such work. (*Id.* ¶ 9.) Additionally, Carbone asserts that service technicians who install and maintain OxyCide dispensers are assigned to territories that vary in geographic scope, and it is "generally expected that Ecolab account representatives and service technicians, including those who work with OxyCide accounts, will live in the territory in which they work." (*Id.* ¶¶ 11–12.)

the contract is between Ecolab Production LLC, a different entity than Defendant Ecolab, Inc., and concerns purchases made by that entity in its role as a "buyer" of chemical substances or mixtures from suppliers, not as a seller to hospitals. (Pl.'s Ex. A [Doc. No. 34] (Ecolab Prod. LLC/Supplier Agmt.).)

The record supports Plaintiff's contention that Ecolab performed initial field testing of OxyCide in Minnesota hospitals, (Pl.'s Opp'n at 29), but it also performed such testing in hospitals in Wisconsin, Michigan, Illinois, California, and North Carolina. (Vercoski Decl., Ex. 34 at 6.)

In sum, the record demonstrates that relevant connections with Minnesota are limited, although some OxyCide field testing occurred in Minnesota (as well as in other states), and Ecolab's corporate headquarters are located in Minnesota. Such limited connections may be insufficient to support the application of Minnesota law. *Johannessohn*, 450 F. Supp. 3d at 965. In *Johannessohn*, although the defendant manufacturer, Polaris, was based in Minnesota and had designed, manufactured, tested, and received complaints about its ATV vehicle in Minnesota, the plaintiffs' alleged physical and economic injuries occurred in the states in which the plaintiffs resided or had purchased the ATVs. *Id*. Under these facts, the court found Minnesota's contacts with the plaintiffs' consumer protection claims "limited," and held that applying Minnesota's consumer protection law would demonstrate disrespect for other states' regulatory schemes, noting that states have adopted different consumer protection regulations to protect consumers within their borders. *Id*.

24

However, in *Sportsman v. Calif. Overland, Ltd.*, No. 17-cv-1064 (DWF/KMM), 2018 WL 1865930, at *4–5 (D. Minn. Apr. 18, 2018), a wrongful death and negligence lawsuit brought against a truck driver's Minnesota employer, the court concluded that Minnesota had sufficient contacts with the facts and issues of the case, beyond the mere fact of the defendant's corporate domicile, such that maintenance of interstate order favored the application of Minnesota law over Wisconsin law.  In particular, the court found the fact that the truck driver regularly drove on Minnesota roads in a vehicle licensed and inspected in Minnesota was relevant to the plaintiff's negligent supervision claim.  *Id.*

Other courts have found maintenance of interstate order to be a neutral factor, favoring neither party.  In *Blake Marine*, the Eighth Circuit determined that Minnesota had sufficient contacts with the facts and issues being litigated, as Minnesota was the state where the alleged tortious interference had occurred, in addition to being the state in which the defendant was located, so as "to mitigate concerns about the disruption of interstate order."  829 F.3d at 595–96 ("The second factor is therefore neutral.")  In *Danielson*, the Minnesota  Court of Appeals found that where Minnesota and two other possible forums had different statutes of limitations, applying Minnesota's statute would demonstrate disrespect for the other two states, and vice versa.  670 N.W.2d at 8.  Because maintenance of interstate order did not "favor" any of the three forums, the court considered it a neutral factor.  *Id.*

Here, as to whether Minnesota's contacts with the facts and issues being litigated are sufficient to pose no risk to the maintenance of interstate order, most of Minnesota's

25

alleged OxyCide connections to Minnesota are not properly supported by the record or are contradicted by record evidence.[10]

By contrast, neither party disputes that Oregon's connections to the facts and issues in this lawsuit include that Sigler is an Oregon resident, her former employer purchased OxyCide in Oregon, Sigler used the product in Oregon, and Sigler's alleged injury occurred in Oregon. In *Hughes*, a products liability action alleging design defect, the Eighth Circuit applied the state law of the plaintiff's domicile, Louisiana, over the state law of the corporate defendant's headquarters, Arkansas, finding that Louisiana had "significant, if not all, contacts with the facts relevant to the litigation." 250 F.3d at 621. Namely, Louisiana was where the plaintiff purchased, used, and sustained an injury from the allegedly defective product, whereas the only connection to Arkansas was that it served as the defendant's principal place of business. *Id*. Similarly, in *In re Baycol Products Litigation*, the court held that maintenance of interstate order weighed in favor of applying the law of the state in which the plaintiff resided, as the drug in question was prescribed and ingested in the state of the plaintiff's residence, and the alleged injury occurred there. 218 F.R.D. 197, 207 (D. Minn. 2003). Again, while Minnesota has some connection to the

---

[10] While the Court finds it proper to consider the Carbone Declaration, which directly rebuts several of Sigler's assertions, it would reach the same conclusion absent the declaration, in light of the evidentiary record. It may be the case that the asserted Minnesota connections find support somewhere in the record, but in general, Plaintiff's citations to the record do not support the connections that she identifies. On summary judgment, the non-moving party "must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik*, 47 F.3d at 957.

facts and issues in this case, beyond its location as Ecolab's headquarters, very few facts are supported by the record.

Sigler relies on *Magnant v. Medtronic, Inc.*, 818 F. Supp. 204, 207 (W.D. Mich. 1993), and *Sportsman*, 2018 WL 1865930, at *4–5, to support her argument that maintenance of interstate order favors the application of Minnesota law. But the facts of these cases are highly specific and distinguishable. *Magnant* involved a conflict between the laws of Michigan and Minnesota, as Michigan, the forum state, did not recognize claims for strict liability, while Minnesota did. 818 F. Supp. at 206. In deciding to apply Minnesota law, the court gave particular weight to several Minnesota contacts beyond the mere fact of Medtronic's corporate presence in Minnesota, including that the plaintiff had resided in Minnesota and undergone pacemaker implantation and subsequent surgery in Minnesota, prior to moving to Michigan, where the alleged injury resulting from the implant occurred. *Id*. By contrast, Minnesota has no such connections with Sigler.

Likewise, *Sportsman* is distinguishable from the facts here. It involved an Illinois decedent's next-of-kin, a Wisconsin car accident, and a Minnesota trucking corporation whose driver (a South Dakota resident) caused a fatal accident. 2018 WL 1865930, at *4–5. The parties disputed whether Minnesota or Wisconsin law applied to the plaintiff's claims for wrongful death and negligence, with neither party seeking to apply the law of Illinois, the domicile of the decedent and his next of kin. *Id*. Ultimately, the court found the business functions of the defendant were the determinative contacts, given that the plaintiff's residence, the defendant's headquarters, and location of injury involved three different states. *Id*. Here, however, the law of Plaintiff's Oregon domicile is directly at

issue, and Oregon is also the location of her exposure to OxyCide, her alleged injuries, and where she obtained medical treatment and worker's compensation benefits—facts that were not implicated in *Sportsman*.

Given Minnesota's limited contacts with the facts and issues here, particularly as compared to Oregon's significant, undisputed contacts, to the extent that maintenance of interstate order is implicated, it favors the application of Oregon law to Plaintiff's product liability-related claims, as Oregon has the most significant contacts with the facts relevant to the litigation. *See In re Baycol Prod. Litig.*, 218 F.R.D. at 207 (stating that this factor weighs in favor of state with the most significant contacts with facts relevant to the litigation) (citing *Hughes*, 250 F.3d at 621); *Gruenwald v. Toro Co.*, No. 19-cv-2294 (PAM/BRT), 2019 WL 6524894, at *3 (D. Minn. Dec. 4, 2019) (finding this factor favored application of law of North Caroline, where plaintiff bought the allegedly defective lawnmower, used it, and where it caught fire, rather than Minnesota, where defendant was headquartered and the mower was designed).[11]

With respect to Plaintiff's breach of warranty claims, to the extent they arise under Minnesota law, the Court reaches the same conclusion. Many of the same facts are relevant to those claims. Oregon has the most significant contacts with those facts, whereas Sigler presents little evidence demonstrating Minnesota's connection. Again, there is no evidence

---

[11] The Court observes that if Minnesota had sufficient contacts with the facts here so as not to disrupt the interstate order, because Oregon has significant contacts, maintenance of interstate order would be a neutral factor, at best. *See Blake Marine*, 829 F.3d at 596.

showing that Sigler even knew of a Minnesota connection with OxyCide.  Accordingly, to the extent that maintenance of interstate order is implicated, this factor favors the application of Oregon law to Sigler's breach of warranty claims as well.

### c.    Simplification of the Judicial Task

Simplification of the judicial task is either immaterial or, at most, a neutral factor here, as the Court could apply the laws of either Minnesota or Oregon without difficulty. *See Hughes*, 250 F.3d at 620 (finding this factor irrelevant, since "[a] federal district court is faced almost daily with the task of applying some state's law other than that of the forum state, and it is equally capable of resolving the dispute under [the laws of the competing states]."); *Danielson*, 670 N.W.2d at 8 (concluding that simplification of the judicial task was a neutral factor that "d[id] not favor any of the forums" because the competing statutes of limitations were "quite clear and easy to apply.")

### d.    Advancement of the Forum's Governmental Interest

When applying the fourth factor, advancement of the forum's governmental interest, courts must "determine which state's law to apply based on 'the relative policy interests of the two states.'"  *Blake Marine*, 829 F.3d at 596.

With respect to Sigler's product liability claims, Minnesota's policy interest in compensating tort victims is implicated by applying Minnesota's statute of limitations.  *See Hughes*, 250 F.3d at 621.  By extension, Minnesota has the same policy interest with respect to breach of express warranty claims, for which it does not require privity of contract.  *See McCormack v. Hankscraft Co.*, 154 N.W.2d 488, 498–99 (Minn. 1967) (rejecting requirement of privity in claims for personal injury based on breach of express

warranty as it serves to eliminate bars to consumer recovery imposed by the law of sales). While Minnesota's interest in compensating tort victims has been extended to non-residents, *see, e.g., Gimmestad v. Gimmestad*, 451 N.W.2d 662 (Minn. Ct. App. 1990), the Eighth Circuit has explained that "a state's 'interest in protecting nonresidents from tortious acts committed within the state . . . is only slight and does not support application of its law to the litigation.'" *Blake Marine*, 829 F.3d at 596 (quoting *Hughes*, 250 F.3d at 621). By contrast, "'[c]ompensation of an injured plaintiff is primarily a concern of the state in which [the] plaintiff is domiciled.'" *Id*. (quoting *Kenna*, 18 F.3d at 627 (8th Cir. 1994)); *see also In re Baycol Prods. Litig*., 218 F.R.D. at 207 ("The Eighth Circuit . . . has not given the [domicile] of the corporate defendant much weight in tort cases.") Accordingly, courts have found that "[t]his factor 'generally weighs in favor of application of the state law in which the plaintiff lives and in which the injury occurred.'" *Johannessohn*, 450 F. Supp. 3d at 965 (quoting *In re Baycol Prods. Litig.*, 218 F.R.D. at 207) (collecting cases)). Because compensation of an injured plaintiff is of primary interest to the state of the plaintiff's residence, Minnesota's interest is not particularly served by applying Minnesota law to a non-resident who was allegedly injured in another state.

Oregon's interest in applying its two-year statute of limitations to product liability-related claims is in providing certainty and predictability to manufacturers doing business in Oregon and whose products are used in Oregon. *See Howard v. Ethicon, Inc*., No. C20-5593 BHS, 2022 WL 445673, at *4 (W.D. Wash. Feb. 14, 2022), *appeal voluntarily dismissed*, No. 22-35236 (9th Cir. June 17, 2022). In *Howard*, the court concluded that Oregon's statute of repose applied in a products liability action, rather than Washington's

statute, as Oregon's statute best served Oregon's interest in uniformity and predictability for manufacturers doing business in Oregon and whose products were used in Oregon, and where the out-of-state defendants' products were used in Oregon and ultimately caused injury there. *Id*. Because Oregon applies its two-year limitations period to all claims related to products liability, including breach of warranty, *see Philpott*, 710 F.2d at 1425, the Court finds that its governmental interest in the two-year limitations period, as well as its requirement of privity of contract for breach of warranty claims, is essentially the same as its interest in its statute of repose—providing certainty and predictability to manufacturers doing business in Oregon and whose products are used in Oregon. *Howard*, 2022 WL 445673, at *4. This interest is served by the facts of this case, as Ecolab does business in Oregon and its products are used in Oregon.

In support of her argument that advancement of the forum's interest favors the application of Minnesota law, Sigler again relies on *Magnant*, 818 F. Supp. at 207, *Sportsman*, 2018 WL 1865930, at *4–5, and *Kolberg-Pioneer*, 823 N.W.2d at 673. The Court finds this authority distinguishable with respect to the advancement of the forum's governmental interest.

As noted earlier, in *Magnant*, the court in the Western District of Michigan concluded that Minnesota's interests in recognizing strict liability claims displaced Michigan law, which did not recognize strict liability claims. 818 F. Supp. at 207. The court found that applying Minnesota law to a Minnesota manufacturer would serve Minnesota's interest in applying its law to its corporations in order to provide them with certainty in the choice of law and predictability of results. *Id*. The court identified

31

Michigan's two potential interests as the protection of its citizens and the adjudication of an injury that occurred in the state. *Id.* However, because the plaintiff would receive more rights under Minnesota law, the court found that consideration of each state's interest favored the application of Minnesota law. *Id.*

But *Magnant* is non-controlling authority and in *Hughes*, the Eighth Circuit stated, "[W]e fail to see how any important [] governmental interest [of the forum state] is significantly furthered by ensuring that nonresidents are compensated for injuries that occur in *another state*." 250 F.3d at 621; *see also Blake Marine*, 829 F.3d at 596 (finding a state's interest in protecting nonresidents from tortious acts committed in the state is only slight and does not support the application of its law to nonresidents). Not only is Sigler a nonresident of Minnesota, her alleged injury occurred in Oregon. Additionally, Minnesota lacks other significant connections to the litigation that were present in *Magnant*, where the plaintiff was a former Minnesota resident who underwent two surgeries directly related to the resulting injury.

In *Sportsman*, the court found that the governmental interest factor favored applying Minnesota law over Wisconsin law because Wisconsin's cap on damages "would unfairly prevent [the decedent's] family . . . from being fully compensated consistent with the laws of [the defendant company's] home state." 2018 WL 1865930, at *6. Although the court acknowledged Wisconsin's general interest in highway accidents within its borders, it found that no parties had significant Wisconsin contacts. *Id.* The decedent and his next of kin were Illinois residents. The court concluded that "the happenstance of the accident's

location" in Wisconsin did not override Minnesota's relevant contacts.[12]  *Id*.  Here, however, Oregon has a particularly relevant interest in the facts and events of this case, since Sigler is an Oregon resident, was exposed to OxyCide in Oregon, was allegedly injured in Oregon, and received treatment in Oregon.  Oregon has a significant interest in protecting its citizens from harmful products, particularly from product-related injuries that occur within its borders, and on Oregon work sites that prompt its citizens to obtain medical treatment in Oregon.  *See Kenna*, 18 F.3d at 627 (finding North Dakota forum's interest in compensating its tort victims would be advanced by applying its law since plaintiff's decedent obtained medical treatment in North Dakota and was a resident of that state).  Minnesota's interest, if any, in compensating a non-resident for injuries that occurred out of state, is only slight.  *See Hughes*, 250 F.3d at 621.

Finally, the Court again finds *Kolberg-Pioneer*, 823 N.W.2d at 675, distinguishable, as it involved an indemnification action for an underlying tort, brought by a downstream seller against the product manufacturer, not a direct claim of products liability against a manufacturer.  In *Kolberg-Pioneer*, the court identified three general policy interests under Minnesota's indemnity law:  compensating tort victims, protecting consumers by imposing the cost of defective products on the product's maker, and promoting settlement and finality.  It found that the imposition of Montana's conflicting indemnity law would thwart

---

[12] Previously, the defendants had filed a declaratory judgment action in Wisconsin state court, seeking a determination that Wisconsin law applied to any wrongful death claims arising out of the decedent's death.  *Sportsman*, 2018 WL 18655930, at *2.  However, the Wisconsin state court dismissed the suit, finding that it lacked personal jurisdiction over the Sportsman next-of-kin.  *Id*.

Minnesota's policy interest of imposing the cost of defective products on the product's maker, stating, "Where, as here, a seller's liability arises solely from its passive role in selling a defective product, it should not be saddled with the costs of defending a product it did not design." *Id*.

Because the facts of this case do not involve a downstream seller, but a direct action against a manufacturer, the crucial policy interest in *Kolberg-Pioneer* is not implicated here. In fact, in *Gruenwald*, a strict liability action brought against a Minnesota manufacturer, the court distinguished *Kolberg-Pioneer*, noting that it was not a direct claim of products liability against a manufacturer, and found that the advancement-of-governmental-interest factor weighed against applying Minnesota law. 2019 WL 6524894, at *3 (finding that given the factual dissimilarity, *Kolberg-Pioneer* "did not undermine the weight of Minnesota authority holding that "'in the event of a conflict, the law of the state in which the plaintiff resides will govern the claim.'") (quoting *In re Baycol*, 218 F.R.D. at 207).

On balance, while the Court does not diminish Minnesota's interest in compensating tort victims, the interest is primarily served by applying Minnesota law to Minnesota residents who were injured in Minnesota. *Blake Marine*, 829 F.3d at 596; *Hughes*, 250 F.3d at 621; *Johannessohn*, 450 F. Supp. 3d at 965. Applying Minnesota law to an Oregon resident whose exposure to the product at issue and alleged injury occurred in Oregon, does not advance Minnesota's primary interest in protecting its residents from tortious acts committed in the state. *Blake Marine*, 829 F.3d at 596. By contrast, Oregon's interest in providing certainty and predictability for manufacturers doing business in Oregon and

34

whose products are used in Oregon is served by applying Oregon law, as Ecolab is a manufacturer that does business in Oregon and its products are used there.

### e.    Better Rule of Law

The Court finds the better-rule-of-law factor irrelevant under these facts and agrees with the Eighth Circuit, which has stated,

> [W]here the conflict centers on competing statutes of limitations, the fifth factor, "application of the better rule of law," would seem to be relatively unimportant. Legislatures rather than courts are best positioned to assess the comparative merits of the competing policy concerns surrounding the selection of particular limitations periods for different causes of action. As such, because the [two states'] legislatures themselves weighed policy considerations and reached different conclusions, we are ill-suited to determine which of the two limitations periods represents the better rule of law.

*Whitney*, 700 F.3d at 1124 (citing *Hughes*, 250 F.3d at 621).

### f.    Weighing of Factors

In conclusion, the Court finds that the balance of factors weighs in favor of applying Oregon law.  Most relevant to the Court's analysis are maintenance of interstate order and advancement of the forum's governmental interest, both of which favor Oregon law.  The remaining factors are either neutral or immaterial.  While the predictability-of-results factor is neutral, the Court finds that applying Minnesota law also best represents the "ideal" that litigation on the same facts, regardless of the forum, should be decided the same[.]" *Nodak*, 604 N.W.2d at 94.  At the hearing on the instant motions, Plaintiff's counsel conceded that if this case had been filed in Oregon, an Oregon court would likely apply Oregon law. (July 11, 2022 Hr'g Tr. [Doc. No. 74] at 39.)

For all of the foregoing reasons, the Court finds that Oregon law applies and because all of Plaintiff's claims are time-barred under Oregon law, Or. Rev. Stat. §§ 30.905; 30.900, they must be dismissed.

### C.   Remaining Matters

In light of the Court's ruling that Oregon's statute of limitations bars Sigler's claims, the Court declines to address Ecolab's remaining arguments for dismissal.

Similarly, the Court need not address Ecolab's Motion to Exclude Expert Testimony as it relates to Dr. Trimble.  Because Plaintiff did not oppose the motion as it relates to Sigler's other two experts, Ecolab's Motion to Exclude Expert Testimony is granted in part as to Drs. Ridley and Monroe, and denied as moot in part as to Dr.  Trimble.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1.   Defendants' Motion for Summary Judgment [Doc. No. 16] is **GRANTED**.

2.   Defendants' Motion to Exclude Expert Testimony [Doc. No. 21] is **GRANTED IN PART** and **DENIED AS MOOT IN PART**.

3.   Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: September 1, 2022                              s/Susan Richard Nelson
                                                     SUSAN RICHARD NELSON
                                                     United States District Judge